Filed 6/25/15  Farhoomand v. Caine CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| KAVEH S. FARHOOMAND,<br><br>    Plaintiff, Cross-defendant and Respondent,<br><br>    v.<br><br>JANET JUSTIN CAINE,<br><br>    Defendant, Cross-complainant and Appellant. | D064302<br><br><br>(Super. Ct. No.<br> 37-2011-00050839-CU-HR-NC) |


APPEAL from a judgment of the Superior Court of San Diego County, Earl H. Maas III, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Fransen and Molinaro and Nathan W. Fransen for Defendant, Cross-complainant and Appellant.

Law Offices of Linda J. Alexander and Linda Joyce Alexander, Paul Marion Grinvalsky; Lotz, Doggett & Rawers and Jeffrey S. Doggett for Plaintiff, Cross-defendant and Respondent.

Defendant, cross-complainant and appellant Janet Justin Caine appeals from a judgment entered in favor of plaintiff, cross-defendant and respondent Kaveh S. Farhoomand following a jury trial on Farhoomand's operative complaint and Caine's operative cross-complaint arising out of a real estate transaction between them, the surrounding circumstances of which were highly contested at trial. By special verdicts the jury made numerous factual findings accepting Farhoomand's claims and rejecting Caine's, resulting in a judgment in Farhoomand's favor in which the trial court found in part that Farhoomand was the prevailing party and ordered Caine to turn over a deed she had executed granting the subject property to Farhoomand. Thereafter, the court ordered Caine to pay cost-of-proof sanctions under Code of Civil Procedure[1] section 2033.420, subdivision (b)(3), and entered an amended judgment awarding those sanctions, costs and attorney fees, as well as declaring the property's purchase price to be $525,000.

On appeal, Caine contends: (1) the court abused its discretion by excluding under Evidence Code sections 350 and 352 testimony and evidence that assertedly showed Farhoomand's cultivation of marijuana at the property; (2) the court lacked jurisdiction to enter the amended judgment declaring the property's purchase price; and (3) the court erred by awarding cost-of-proof sanctions after she had filed her notice of appeal and also abused its discretion by including a substantial attorney fee award in connection with those sanctions. We agree the trial court lacked jurisdiction to amend the judgment to include the property's purchase price. We reverse that portion of the judgment and

---

[1] Statutory references are to the Code of Civil Procedure unless otherwise specified.

remand the matter with instructions that the court modify it to omit that declaration. In all other respects, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

*Farhoomand and Caine's Relationship*

Farhoomand is a physician in internal medicine with a private practice in Oceanside, California. Caine and her husband maintained multiple residences in Nevada and California. In 2007, another physician referred Caine to Farhoomand and Farhoomand began treating Caine's husband, who was then gravely ill with various chronic conditions. Given his severe condition and because Caine requested it, Farhoomand began making house visits to Caine's husband at their Oceanside residence, and continued to treat him there and in the hospital until he died in March 2008. On two occasions during this time, Caine stuffed a $1000 check into Farhoomand's pocket and insisted he take it as a gift or tip, telling him she would be offended if he did not. Farhoomand and Caine eventually became close friends: Farhoomand took to calling her "Aunt Janet" as did other friends of Caine's, and Caine referred to Farhoomand as her "nephew." Eventually Caine asked Farhoomand to become her physician, and he saw her four times in mid-2008 and early 2009. In late 2008, Farhoomand's marriage was deteriorating and Caine was still grieving her husband's death. They began having dinner together and talked increasingly over the phone until they spoke once a day, treating each other as family. They both expressed love for each other as friends.

In September 2008, Caine offered to lend Farhoomand $50,000 and he executed a promissory note payable "on demand" by Caine for the monies, which Farhoomand used

3

to pay credit card debt from his marriage. Caine then inserted herself into Farhoomand's business and affairs, telling him he had helped her husband, he was her "project," and it was now her place to "straighten out [his] life."[2] Thereafter at various times Caine lent Farhoomand additional sums of money and helped him with his finances as well as the disposition of Farhoomand's home following his divorce. Farhoomand began to repay Caine in June 2009.

In the spring of 2009, Caine and her realtor began looking for a house for Farhoomand to purchase. Caine, herself a licensed real estate agent in California, told Farhoomand it would be an investment for her and beneficial to him in that they would consolidate his preexisting debts to her in a mortgage, and give him a better interest rate than his old house and her a better rate than a bank. Eventually, she located a house on Juniper Lane (the Juniper property) and closed escrow in July 2009, sending Farhoomand a card on the day escrow closed reading, " 'Hope your new address . . . [¶] . . . [¶] . . . Feels more like home every day. Congratulations.' " In it, she handwrote a note telling Farhoomand to "enjoy your new life" and asking him not to bring physical or mental " 'baggage . . . into your new home.' " Caine's realtor at the time noted that Caine was buying the house for her "nephew," who the realtor understood was Farhoomand.

---

[2]     Farhoomand testified that Caine "told me that she wanted to help me, straighten me out financially after the divorce. She said that she's a business women and she's savvy and that it would be therapeutic for her to make me a project"; that it was "good for her to do" that. Farhoomand testified, "We were good friends, so I trusted her. She said that she was—she had done real estate for many, many years. And she also said that it was good for her. It was therapeutic for her." In deposition testimony admitted at trial, Caine testified that if she could help Farhoomand she would do it, that she was alone and depressed and it was like therapy to her.

Caine told Farhoomand she would handle the arrangements and documentation. She took him to a document center where Caine signed a grant deed conveying the Juniper property to Farhoomand, and Farhoomand signed a note secured by a deed of trust, both prepared by broker and notary Doreen Kessinger. Kessinger also prepared and certified a preliminary change of ownership report, signed by Farhoomand and initialed by Caine, indicating the transaction was a purchase and that Caine was transferring 100 percent of the interest in the Juniper property to Farhoomand via a $605,000 loan "[c]arried by seller" secured by a first deed of trust at 5.5 percent interest for a 30-year term. Caine and Farhoomand told Kessinger that the Juniper property was going to be Farhoomand's primary residence, and Kessinger understood that Caine was selling the property to him as the lender.[3] Caine approved the note, trust deed, change of ownership report, and an amortization schedule. Kessinger did not notice any indicia of duress or undue influence in connection with the transaction, and she went over every line of the documents with Caine before Caine signed them. Caine took all of the documents, which were unrecorded, and told Kessinger she would record them later.

---

[3] At trial, Farhoomand's office assistant testified that Caine told her she was buying Farhoomand a house and selling it to him; that she "was going to make him walk away from his old house and get him a new house, a better house, and then he was just going to be making the payments to her, and it was just going to be like a win, win situation." Grant Jacobson, who was a landscaper, testified he was hired by Caine and Farhoomand to be the gardener at the Juniper property. According to Jacobson, Caine told him that she had purchased a house and sold it to Farhoomand, and that the house needed a gardener. Caine made an initial prepayment, then Farhoomand paid Jacobson's bills every month thereafter.

The note securing the deed of trust indicates Caine gave Farhoomand a 30-year loan of $605,000 at a 5.5 percent interest rate. The total loan amount was calculated by adding the $525,000 purchase price to Farhoomand's existing debts, and included money Caine spent to purchase furniture for Farhoomand.[4] Caine prepared two mortgage ledgers and made handwritten entries for Farhoomand's monthly payments, which were usually each in the sum of $5,000 or more. Farhoomand moved into the Juniper property in October 2009 and Caine lived there while some construction was occurring, but soon afterwards Farhoomand asked to live in the house by himself. In response to Farhoomand's request, Caine wrote Farhoomand a note telling him they were "on the same page" and that it was "foolish" of him to ask, as she had to return to her own affairs.[5] Caine moved out of the Juniper property within a couple of days. Farhoomand paid the utilities, property taxes, home warranty and homeowner's insurance on the Juniper property until 2012, when Caine paid the property taxes and insurance "out from under" him.

After November 2010, Caine and Farhoomand had a falling out and Caine stopped accepting Farhoomand's checks. Farhoomand terminated his physician/patient

---

[4]    In discovery responses read to the jury, Caine admitted the principal balance of $605,000 was "based on the fair market value of the Juniper property, the furnishings in the Juniper property, and the outstanding balance of Dr. Farhoomand's loans he received from responding party."

[5]    Caine read her note into the record. It stated: "Dear one, either you read my mind or you overhear my phone calls, as we are, once again, on the same page. How foolish of you to ask. I really must get back to my own affairs, though I will always be on tap for you, as you know. We'll always be closely connected, no matter what distance is between us. . . . Love you, Janet."

relationship with Caine. In December 2010, Caine served him with an eviction notice and claimed the Juniper property was her house, though he attempted to make payments in December and January. Feeling he had been "duped," Farhoomand eventually obtained a court order permitting him to deposit payments into an interest-bearing account. He also applied for and obtained a restraining order against Caine.

*The Lawsuits*

In January 2011, Farhoomand filed suit against Caine for, inter alia, breach of contract and breach of the covenant of good faith and fair dealing. Caine answered and filed a cross-complaint asserting causes of action for elder abuse, conversion, breach of fiduciary duty, fraud, unjust enrichment, intentional infliction of emotional distress and rescission. In March 2011, Farhoomand filed a first amended complaint alleging causes of action for breach of contract, breach of fiduciary duty, constructive and promissory fraud, and declaratory relief/quiet title. He sought an injunction, interpleading of the monies paid on the Juniper property, an accounting, and implied contractual or equitable indemnity. In part, Farhoomand alleged that Caine gave him real estate advice in 2009 and purchased the Juniper property with the parties' understanding that she would purchase it for his benefit and sell it to him with Caine holding the mortgage and Farhoomand making monthly payments for its purchase. He alleged they entered into an oral agreement whereby Caine would transfer title to the Juniper property by grant deed to Farhoomand, and Farhoomand would pay Caine $605,000 at a 5.5 percent interest rate. He alleged that while a grant deed, note, preliminary change of ownership report, deed of

7

trust and loan schedule were prepared, Caine instructed the document center not to file the documents, then served Farhoomand with a notice to vacate the premises.

Caine eventually filed a first amended cross-complaint in part alleging financial elder abuse. She alleged Farhoomand had engaged in a "surreptitious scheme . . . to take financial advantage" of her by convincing her he was her friend while he acted as her physician. She alleged he improperly accepted money from her while she was emotionally and physically depleted, and manipulated her into lending him money, which she "felt compelled" to do because she "felt she had no choice." Caine alleged she purchased the Juniper property in her own name, furnished it, and began residing in it. Caine alleged that in September 2009, Farhoomand expressed an interest in purchasing the Juniper property from her, and based on his false representations, she allowed him to reside there and would transfer title to him on the condition that he repay the personal loans, pay for the furnishings, and make an approximately 20 percent down payment. Caine alleged that Farhoomand agreed in response he would only use the Juniper property for legal purposes and would continue to be her physician and friend, and that she prepared the note, deed of trust and grant deed only for "estate purposes" so her heirs would know her wishes; she purposely did not deliver or record them with Farhoomand's knowledge and consent. Caine alleged that in early December 2010, she discovered Farhoomand was cultivating and using marijuana and confronted him about it, after which he discontinued his contact and care. She alleged he changed the locks on the Juniper property and sought a temporary restraining order against her, falsely alleging she harassed him in order to prevent her from visiting or staying at her property.

8

*Farhoomand's In Limine Motion*

Following the parties' unsuccessful dispositive motions, the matter proceeded to a jury trial. Before trial, Farhoomand moved in limine to exclude evidence and testimony from Caine—originally contained in an earlier-filed opposing summary judgment declaration—regarding marijuana and its use or cultivation. He argued the probative value of any such evidence or testimony would be substantially outweighed by undue prejudice, the evidence would confuse or mislead the jury, and it would unduly consume time under Evidence Code section 352. He also argued such evidence or testimony would lack foundation and constitute improper character evidence. He asserted Caine could not demonstrate that any alleged breach of the deed of trust arising from purported marijuana was material or caused any damage. As to the latter point, Farhoomand argued the deed of trust merely required the trustor to "commit or permit no . . . violation of laws . . . relating to use, alterations or improvements . . . and do all other acts which . . . this Deed of Trust may require to preserve this security" and that Caine's sole recourse was not to invalidate the trust deed, but to have Farhoomand "appear in and defend any action or proceeding purporting to affect the security" or the beneficiary or trustee's rights. He maintained Caine could not show any action or proceeding had been commenced, or that Farhoomand had not appeared or failed to defend any such action.

In opposition, Caine argued the evidence was not impermissible character evidence but rather was critical to her defense of Farhoomand's breach of contract action in that Farhoomand was required to show he had substantially performed under the contract or that his performance was excused. She argued that California and Federal law

9

subjected property used to manufacture controlled substances to forfeiture and exposed her to serious threat of criminal liability, which was relevant to explain why she served the 60-day notice to vacate and as to her severe emotional distress. She argued the fact Farhoomand was growing marijuana at the property and likely abusing it was a factor that tended to show he may have committed elder abuse.

The court granted Farhoomand's motion on both relevance and Evidence Code section 352 grounds. It stated that "the quantity, the quality, the amounts, the circumstances actually all have a great deal to do with the criminality of the event. And the only thing I've seen so far is a picture of some small seedlings that you can't tell from the picture that they're marijuana, but sounds like there may be circumstances that would support the suggestion that it is. And maybe even a statement from Dr. Farhoomand that they were his father's marijuana. But it's a side issue that I think could take the jury completely down the wrong path." At the same time, the parties discussed whether the court would admit evidence of the restraining order Farhoomand had obtained against Caine, and the court indicated the underlying factual findings supporting that order—which did not mention any facts concerning marijuana—could be relevant on Caine's defenses and cross-complaint depending on Caine's testimony. Caine's counsel protested that Caine was unable to tell the jury "what precipitated all of this" and that the marijuana evidence was a "big, big part of this case." The court responded it had a picture of eight seedlings;[6] that that amount of seedlings was "consistent with personal use, which in

---

[6] The photographs actually show six boxes of some sort of seedlings.

10

California isn't a crime. . . . I've got one picture and your statements, even if I accept those as true, I don't think they're violations of the law. [¶] And if it's a sale, she doesn't have the right to tell him to stop. If it's a rental, she doesn't have the right to tell him to stop." The court acknowledged that federal law was different, and "the reason I'm keeping [the marijuana evidence] out under [Evidence Code section] 352 [is] that it's . . . a side issue." It reiterated its ruling while explaining that Caine was bound by the findings of the judge who had presided over the restraining order proceedings, stating that Caine "can't argue separately from what that judge has found. [¶] But if she doesn't deny that or if she says, 'Yeah, I yelled at his mother and at him, but I was mad because he was stealing my money and stealing my house and everything else,' I think that's fair game. I just don't think that this marijuana thing—it's not in here. And grant it, I haven't read every transcript of everything that was said, but I read the statements of decision, the objection, . . . and final statement of decision [on the restraining order]. And I think under [Evidence Code section] 352, if we start going down that path, I run the risk that— I run two risks. One, that some jurors thinks that everybody who has ever used marijuana is a drug person and should be found against. On the other hand, we have got to question them about medicinal marijuana and their knowledge of that. And we may end up with somebody who takes sympathy. It's a side issue we're not going to go on."

*Trial Evidence*

At trial, Farhoomand testified that before Thanksgiving 2010, he had told Caine that he was dating a woman named Samantha, and believed Caine would be happy for him. Instead, Caine researched the woman, called his family, and came to his office

11

saying his girlfriend was uneducated, unfit and loose. According to Farhoomand, on the Thanksgiving holiday weekend, Caine called him and told him she was coming to the Juniper property to throw his girlfriend out and made derogatory comments. Farhoomand testified that Caine arrived at the house and yelled at him from her car, telling him he had five minutes to get her out of the house or Caine would throw her out herself. He testified that the next day, he brought his mortgage payment and Caine's Oceanside house keys back to her and told her he could not be her doctor. In December 2010, Caine left berating messages on Farhoomand's phone, in part calling him a "dumb fuck" and telling him he was letting "a nobody that has nothing to dictate to you" and should "get rid of the god damn ho."

Caine testified that she purchased the Juniper property to use as a residence and live in it herself, and she did so when she was in California until December 2009. Caine denied that the dual ledgers in her handwriting were mortgage ledgers despite the fact that they read "mortgage balance," contained "principal" and "interest" columns, reflected a 30-year term, and showed the balance decreasing when Farhoomand made payments. Caine testified that Farhoomand was paying her back and living on the property, and she characterized his interest payments as rent. According to Caine, her agreement with Farhoomand was that she would turn the property over to him if he had made enough payments—about 20 percent of the $526,000 cost—to obtain "hard money equity" in it. Caine denied getting upset about Farhoomand's girlfriend or that she had inquired about the woman with Farhoomand's office assistant and sister. Though she admitted going to the Juniper house, she denied ever speaking to Farhoomand's girlfriend, telling

12

Farhoomand she never wanted to see his girlfriend at the Juniper property, or calling his girlfriend names.  Caine admitted she later mailed Farhoomand a card in which she wrote that Samantha—who she referred to as a "hoe handle"—had "destroyed our four-year friendship."

Caine was permitted to testify that on December 6, 2010, she discovered some activity on the Juniper property that she thought jeopardized her interest in it; that she was "worried to death"  and was "very suspicious of what was going on . . . like I'm going to be losing my property" and her investment in it.  She testified that she called Kessinger, who instructed her to file a 60-day notice to evict Farhoomand.  Caine testified she believed she was locked out of the Juniper property around December 10, 2010, maybe December 8, 2010, and Farhoomand terminated his doctor/patient relationship with her on December 8, 2010.

*The Jury's Verdicts and Posttrial Motions*

The jury returned eight special verdicts on the parties' causes of action, making unanimous special findings in Farhoomand's favor on his breach of contract, concealment/breach of fiduciary duty, false promise, negligent misrepresentation and intentional misrepresentation causes of action.[7]  It likewise made findings in

---

7    In part, the jury found that the parties had entered into a contract, Farhoomand did all or substantially all of the significant things the contract required him to do, Caine had failed to do something the contract required her to do, and Farhoomand was harmed by her failure.  It found Caine owed Farhoomand a fiduciary duty but failed to disclose a material fact she should have disclosed, deceiving Farhoomand and causing him financial damage.  The jury found Caine made an important promise and false representation to

13

Farhoomand's favor on the causes of action in Caine's cross-complaint for financial elder abuse, intentional infliction of emotional distress, and conversion. The jurors left blank the lines for past and future noneconomic damages, and the court confirmed during polling that the jury intended to award zero damages on those items.

In June 2013, the court entered judgment in Farhoomand's favor on his first amended complaint and Caine's cross-complaint, granting specific performance of the contract for the Juniper property's transfer from Caine to Farhoomand. The judgment required turnover of the grant deed to the court, release of the funds held in trust to Caine, and payments of $3,150 by Farhoomand to Caine until the note was paid in full. The judgment stated it was to be amended or supplemented to reflect costs and attorney fees.

In July 2013, Caine filed her notice of appeal from the judgment.

DISCUSSION

I. *Exclusion of Marijuana Evidence*

Caine contends the trial court abused its discretion by excluding her testimony and other evidence regarding Farhoomand's alleged marijuana cultivation. She repeats her contentions asserted in opposition to Farhoomand's in limine motion, and we address each in turn below.

A. *Legal Principles*

"No evidence is admissible except relevant evidence." (Evid. Code, § 350.) The Evidence Code defines relevant evidence to mean "evidence . . . having any tendency in

Farhoomand without intending to perform them, and Farhoomand relied upon her promise and representation causing him financial damage.

14

reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) "The test of relevance is whether the evidence tends ' "logically, naturally, and by reasonable inference" to establish material facts . . . .' " (*People v. Scheid* (1997) 16 Cal.4th 1, 13; see also *Velasquez v. Centrome, Inc.* (2015) 233 Cal.App.4th 1191, 1211.) "A trial court 'is vested with wide discretion in determining the relevance of evidence,' but it has 'no discretion to admit irrelevant evidence.' " (*Velasquez*, at p. 1211.)

"[E]ven relevant evidence may be excluded under Evidence Code section 352, which provides that the trial court 'may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' In general, evidence is substantially more prejudicial than probative if it poses an intolerable risk to the fairness of the proceedings or the reliability of the outcome. [Citation.] Exclusion of evidence under Evidence Code section 352 is reserved for those cases where the proffered evidence has little evidentiary value and creates an emotional bias against the party. [Citation.] [¶] We review any ruling by the trial court as to the admissibility of evidence for abuse of discretion. [Citations.] We do not substitute our judgment for that of the trial court and may grant relief only when the asserted abuse of discretion constitutes a miscarriage of justice." (*Hernandez v. County of Los Angeles* (2014) 226 Cal.App.4th 1599, 1613.)

15

B.  *Farhoomand's Breach of Contract Claim*

Caine contends the marijuana evidence was critical to show Farhoomand's breach of the deed of trust that he sought to enforce in his breach of contract cause of action; she points out cultivation is illegal under California law with a possible exception for personal medical purposes with a physician's approval, and also illegal under federal law such that Farhoomand's actions would violate "an express and material term of the deed of trust . . . ."  She maintains that if the jury had considered this evidence, they could have decided Farhoomand's breach of this provision precluded him from succeeding on his breach of contract claim.

The law is settled that the breach of an "*important* condition" to a contract may relieve the other party from his or her obligations (*Wiz Technology, Inc. v. Coopers & Lybrand* (2003) 106 Cal.App.4th 1, 12, italics added; Civ. Code, § 1439), and thus "a plaintiff suing for breach of contract must prove [he] has performed all conditions on [his] part or that [he] was excused from performance."  (*Consolidated World Investments, Inc. v. Lido Preferred Ltd.* (1992) 9 Cal.App.4th 373, 380; *Fairchild v. Park* (2001) 90 Cal.App.4th 919, 934.)  " 'A party complaining of the breach of a contract is not entitled to recover therefor unless he has fulfilled his obligations.' "  (*Wiz Technology, Inc. v. Coopers & Lybrand*, at p. 12.)  Farhoomand's contract theory on which the jury was instructed was that he and Caine had entered into an oral or implied agreement, the terms of which were reflected in the deed of trust and other documents prepared by Kessinger, and that Caine breached their contract by failing to record the deed and attempting to evict him even though he did all the things required of him under their agreement.  Under

16

the above principles, it was Farhoomand's burden to establish he did all or substantially all of the significant things their contract required him to do, and he presented proof that he made regular mortgage payments to Caine, and then to the interest-bearing account after their relationship ended, in accord with (and mostly exceeding) the terms of the unrecorded trust deed and amortization schedule.

Caine relies on the provision of the trust deed stating: "TO PROTECT THE SECURITY HEREOF, TRUSTOR AGREES: (1) . . . to commit or permit no waste, no violation of laws or covenants or conditions relating to use, alterations or improvements . . . and do all other acts which . . . this Deed of Trust may require to preserve this security." To demonstrate the relevance of Farhoomand's alleged marijuana cultivation on the theory that it was a material violation of the trust deed, however, Caine was required to show not just a violation of law, but also a resulting diminution in the value of the property such that her security was substantially impaired. (See *Miller v. Waddingham* (1891) 91 Cal. 377, 381-382 [so long as the sufficiency of the security is unimpaired, a vendor who holds legal title to property as security for the fulfillment of a purchase contract "has no right to disturb the vendee in any use or enjoyment which he may make of the land. Such use and enjoyment by the vendee is a use of his own property, and unless he thereby impairs the security, or diminishes the estate which he received from the vendor, or the value of the land as he received it, he should not be restrained"]; Civ. Code, § 2929 ["No person whose interest is subject to the lien of a mortgage may do any act which will substantially impair the mortgagee's security"]; 4 Miller & Starr, Cal. Real Estate (3d ed. 2011) § 10:67, p. 10-264.)

17

The probative value of the marijuana evidence on the question of whether Farhoomand substantially performed their contract, thus turned not only on whether Caine could establish the six seedling boxes were in fact marijuana seedlings, but also on whether the existence of the seedlings violated the law, and whether such a violation resulted in the property's diminished value and substantial impairment in Caine's security. Caine made no such showing in opposition to Farhoomand's motion in limine; she offered no proof that any lawsuit was threatened so as to jeopardize the security or that the Juniper property's value was diminished in any way by Farhoomand's conduct. We conclude the trial court did not abuse its discretion in excluding on relevance grounds Caine's testimony concerning her belief Farhoomand was growing marijuana or the photographs of the purported seedlings. Such evidence did not tend to disprove the substantial performance element of Farhoomand's breach of contract claim.

C. *Demise of the Parties' Relationship*

Caine contends the marijuana evidence was "extremely probative" to explain the demise of her relationship with Farhoomand and the reason she served him with the eviction notice. She points out Farhoomand was permitted to recount details of her hostility toward his girlfriend, which she denied, and she asserts she was left unable to controvert that narrative. Caine argues that absent the marijuana evidence, the jury was "left with the sense that Caine was an irrationally scorned and bitter woman, and Farhoomand, a victim of her overbearing control and rage."

Based on the claims presented to the jury, we see the deterioration of Caine's and Farhoomand's relationship, and Caine's service of the eviction notice, of tenuous

18

importance to the action. The main controversy was the parties' differing positions concerning their contract and Farhoomand's interest in the Juniper property. Farhoomand's claim, which was supported by abundant documentary and other evidence including the testimony of document preparer Kessinger and Caine's realtor, was that he and Caine had agreed Caine had sold him the Juniper property under the terms contained in the note, deed of trust and other unrecorded documents prepared by Kessinger. Farhoomand demonstrated he made mortgage payments to Caine and then to the interest-bearing account in compliance with those terms. In response, Caine maintained their agreement was different: that Farhoomand would live in the Juniper property while he repaid her the monies he borrowed as well as rent, and she would turn the property over to him if he met a condition precedent of paying Caine 20 percent of the $525,000 purchase price. She denied Farhoomand's payments were mortgage payments. Caine also claimed no contract was created because she was unduly influenced and, her consent was obtained by duress or fraud by Farhoomand. The jury received instructions on those affirmative defenses.

It may be that evidence of Caine's belief that Farhoomand was unlawfully growing marijuana tended to explain why she served her eviction notice on him, and countered Farhoomand's claim that she only did so because she harbored ill will toward his girlfriend. However, we agree with the trial court that any probative value of the evidence on that collateral matter—particularly in view of the fact Farhoomand is a medical doctor and the evidence his father suffered from cancer at the time—was substantially outweighed by its unfairly prejudicial effect. Evidence of marijuana

19

cultivation would pose a great risk of allowing the jury to decide the case on purely emotional grounds based on a general contempt for drug use. Individuals have strong attitudes about marijuana and such evidence could lead the jury to presume Farhoomand was a drug user and cast doubt on his character. Admission of the evidence would unduly consume time in assessing the foundation for and reasonableness of Caine's belief, and would have devolved into a minitrial into medical marijuana laws requiring a showing to the jury of legal and nonlegal uses of marijuana under both California and Federal law. For these reasons, the trial court did not abuse its discretion in concluding the probative value of the purported marijuana evidence was substantially outweighed by its prejudicial effect so as to preclude its admission under Evidence Code section 352.

D. *Financial Elder Abuse Claim*

The trial court did not abuse its discretion by concluding the marijuana evidence did not tend to prove or disprove any disputed fact that was of consequence to Caine's financial elder abuse cause of action. (Welf. & Inst. Code, § 15610.30.[8]) Citing Welfare

---

[8]  As it was defined at the time of trial in this matter, financial abuse of an elder occurs when a person: "(1) Takes, secretes, appropriates, obtains, or retains real or personal property of an elder or dependent adult for a wrongful use or with intent to defraud, or both. [¶] (2) Assists in taking, secreting, appropriating, obtaining, or retaining real or personal property of an elder or dependent adult for a wrongful use or with intent to defraud, or both. [¶] (3) Takes, secretes, appropriates, obtains, or retains, or assists in taking, secreting, appropriating, obtaining, or retaining, real or personal property of an elder or dependent adult by undue influence, as defined in Section 1575 of the Civil Code." (Former Welf. & Inst. Code, § 15610.30, subd. (a).) Absent intent to defraud or undue influence, a plaintiff must prove at least a " 'wrongful use' " of property. (Welf. & Inst. Code, § 15610.30, subd. (a)(1); *Stebley v. Litton Loan Servicing, LLP* (2011) 202 Cal.App.4th 522, 527-528.) Effective January 1, 2014, the Legislature amended Welfare and Institutions Code section 15610.30, subdivision (a)(3) to refer to a

and Institutions Code section 15600, subdivision (e) for the proposition that a caretaker's abuse of alcohol or drugs can be a "factor[]" that contributes to elder abuse, neglect or abandonment, Caine contends Farhoomand's marijuana cultivation is "effectively an element" of her financial elder abuse claim. The contention is meritless. Even if Caine were permitted to testify that the seedlings she observed in the closet were marijuana, there was no direct or circumstantial evidence that Farhoomand was using or abusing marijuana, or under the influence of marijuana at any time. More importantly, evidence of marijuana cultivation, standing alone, is not probative on whether the person cultivating it took or retained another person's property for wrongful use, with intent to defraud, or by undue influence as required to prove financial abuse of an elder.

E. *Prejudice*

Even if we were to conclude the trial court abused its discretion in excluding the marijuana evidence, we would hold Caine cannot show prejudice so as to compel reversal of the judgment. In evaluating the effect of any error, we are governed by article VI, section 13 of the California Constitution, which precludes reversal unless " 'the error complained of has resulted in a miscarriage of justice.' " (See *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800-802.) To determine whether a miscarriage of justice results from the erroneous exclusion of evidence, we examine the "entire cause," including the evidence. (Cal. Const., art. VI, § 13; Evid. Code, § 354; *California Crane School, Inc. v.*

---

broader definition of undue influence. (Stats. 2013, ch. 668, § 2; see *Bounds v. Superior Court* (2014) 229 Cal.App.4th 468, 479.) We presume the jury instruction on this issue was based on the prior version of the statute.

*National Commission for Certification of Crane Operators* (2014) 226 Cal.App.4th 12, 24.) "A miscarriage of justice occurs only when the reviewing court is convinced it is reasonably probable a result more favorable to the appellant would have been reached absent the error." (*California Crane*, at p. 24; *Coastside Fishing Club v. California Fish and Game Commission* (2013) 215 Cal.App.4th 397, 428; *P&D Consultants, Inc. v. City of Carlsbad* (2010) 190 Cal.App.4th 1332, 1348 [erroneous exclusion of evidence causes prejudice amounting to a miscarriage of justice only if " 'a different result was probable if the evidence had been admitted' "]; see also Evid. Code, §§ 353, 354; Code Civ. Proc., § 475.) Probability in this context means merely a " '*reasonable chance*, more than an *abstract possibility*.' " (*Cassim*, at p. 800.)

It is Caine's burden to demonstrate prejudice under these standards. (*Saxena v. Goffney* (2008) 159 Cal.App.4th 316, 332; *Paterno v. State of California* (1999) 74 Cal.App.4th 68, 105 [appellant bears the duty of spelling out in her brief exactly how the error caused a miscarriage of justice].) " 'Prejudice is not presumed . . . .' " (*Turman v. Turning Point of Central California, Inc.* (2010) 191 Cal.App.4th 53, 58.)

Our review of the entire record (*Cassim v. Allstate Ins. Co.*, *supra*, 33 Cal.4th at pp. 801-802), compels us to conclude that had Caine been permitted to testify about her belief that Farhoomand was growing marijuana seedlings and admit her photographs, it would not have changed the outcome of this trial. Farhoomand presented abundant evidence, including Caine's own handwritten notes and telephone messages, that severely undermined and effectively destroyed Caine's credibility on nearly every contested issue. Independent witnesses testified that Caine had agreed to purchase the Juniper property so

22

she could in turn sell it to Farhoomand, and that Caine had approved the deed of trust and note, preliminary change of ownership and amortization schedule without any indication of undue influence or duress. Caine's handwritten mortgage ledgers supported Farhoomand's claim that they had entered into a purchase contract under the terms of the written documents. The jury rejected Caine's version of events in its detailed special verdict findings, and we see nothing about the purported marijuana evidence that would have changed the result of the trial. We conclude Caine has failed to establish that any purported evidentiary error resulted in a miscarriage of justice.

## II. *Entry of Amended Judgment*

In October 2013, several months after Caine filed her notice of appeal, the court entered an amended judgment awarding Farhoomand costs and attorney fees. It also added the following line to the judgment: "The Court has determined that the purchase price by Plaintiff to Defendant of the property known as 908 Juniper Lane was $525,000."

Caine contends her July 2013 notice of appeal divested the court of power to amend the judgment in that manner, and even absent her notice of appeal, the court lacked power to amend the judgment for judicial error. She is correct that the filing and perfecting of the notice of appeal divested the court of jurisdiction to amend the judgment. (*Takahashi v. Fish & Game Com.* (1947) 30 Cal.2d 719, 725 ["An appeal removes from the jurisdiction of the trial court the subject matter of the judgment or order appealed from, including all issues going to the validity or correctness of such judgment or order. The trial court has no power thereafter to amend or correct the judgment or

23

order, or to vacate or to set it aside"], revd. on other grounds, *Takahashi v. Fish & Game Com.* (1948) 334 U.S. 410; *California State Auto. Assn. Inter-Ins. Bureau v. Jackson* (1973) 9 Cal.3d 859, 862, fn. 3; *Eisenberg v. Superior Court* (1924) 193 Cal. 575, 578-579; *Linstead v. Superior Court* (1936) 17 Cal.App.2d 9, 12; *Foggy v. Ralph F. Clark & Associates, Inc.* (1987) 192 Cal.App.3d 1204, 1211.)

The court, however, retained jurisdiction to decide postjudgment fees and costs notwithstanding the appeal from the final judgment. (*Bankes v. Lucas* (1992) 9 Cal.App.4th 365, 368; see Code, Civ. Proc., § 904.1; *P R Burke Corp. v. Victor Valley Wastewater Reclamation Authority* (2002) 98 Cal.App.4th 1047, 1053 ["if a judgment determines that a party is entitled to attorney's fees but does not determine the amount, that portion of the judgment is nonfinal and nonappealable" until the amount of fees is determined].) A partially void judgment can be modified in order to save the portion that was not in excess of jurisdiction. (*Dakota Payphone, LLC v. Alcaraz* (2011) 192 Cal.App.4th 493, 503 [when a "judgment only partially exceeds the trial court's jurisdiction, the trial court can modify the judgment in order to save the portion that was not void"].) The portion amending the original judgment to add Farhoomand's costs and attorney fees is unaffected by this reversal. On remand, the trial court is to modify the amended judgment to omit the declaration concerning the property's purchase price.

III. *Motion for Cost-of-Proof Sanctions*

Following trial, Farhoomand moved for cost-of-proof sanctions under section 2033.420, subdivision (b)(3). He argued Caine had either denied or failed to admit five key issues in response to his discovery requests for admissions which he later proved true

24

at trial, and the sought-after admissions were of such substantial importance that they would have expedited or shortened the trial had Caine admitted them. Farhoomand asked Caine to admit: (1) "you purchased the [Juniper property] so that you could sell the property to Farhoomand"; (2) "you had an agreement with Farhoomand for the sale of the property to him"; (3) "Farhoomand is entitled to ownership of the property"; (4) "you added any and all monies owed to you, including improvements, furnishings and all other monies, to the mortgage for the property"; and (4) "Farhoomand did not commit financial elder abuse." (Some capitalization omitted.)

Farhoomand sought an award of $287,040 in attorney fees as well as $7,448.05 in expert fees and costs. In September 2013, the trial court declared Farhoomand the prevailing party and granted Farhoomand's motion, awarding him the requested amount of attorney fees as cost-of-proof sanctions.

A. *Legal Principles*

"A party to a civil action may propound a written request that another party 'admit the genuineness of specified documents, or the truth of specified matters of fact, opinion relating to fact, or application of law to fact.' [Citations.] Section 2033.420 provides, '(a) If a party fails to admit the genuineness of any document or the truth of any matter when requested to do so under [section 2033.010], and if the party requesting that admission thereafter proves the genuineness of that document or the truth of that matter, the party requesting the admission may move the court for an order requiring the party to whom the request was directed to pay the reasonable expenses incurred in making that proof, including reasonable attorney's fees. [¶] (b) The court shall make this order unless it

25

finds any of the following: [¶] (1) An objection to the request was sustained or a response to it was waived under Section 2033.290. [¶] (2) The admission sought was of no substantial importance. [¶] (3) The party failing to make the admission had reasonable ground to believe that that party would prevail on the matter. [¶] (4) There was other good reason for the failure to admit.' . . . ' "[T]he determination of whether 'there were no good reasons for the denial,' whether the requested admission was 'of substantial importance,' and the amount of expenses to be awarded, if any, are all within the sound discretion of the trial court." ' " (*City of Glendale v. Marcus Cable Associates, LLC* (2015) 235 Cal.App.4th 344, 351-352, quoting *Bloxham v. Saldinger* (2014) 228 Cal.App.4th 729, 753.)

"[A]n award of expenses pursuant to section [2033.420] is not a penalty. Instead, it is designed to reimburse reasonable expenses incurred by a party in proving the truth of a requested admission . . . such that trial would have been expedited or shortened if the request had been admitted." (*Brooks v. American Broadcasting Co.* (1986) 179 Cal.App.3d 500, 509 [discussing section 2033, subdivision (o), the predecessor to section 2033.420]; accord, *Stull v. Sparrow* (2001) 92 Cal.App.4th 860, 865.) "[A]n award of costs of proof for a denial of a request for admission involves the weighing of a number of factors, such as whether the matter denied was of 'substantial importance;' whether there was a 'reasonable basis' for the denial; whether the party making the denial knew or should have known at the time that the requested matter was of 'substantial importance' and was true; whether there were 'other good reasons for the denial'; and whether and to what extent the responding party made a good faith effort otherwise to resolve the matter.

26

[Citations.] Also, unlike sanctions for discovery misconduct, costs of proof under section 2033.420 are awarded after trial; therefore, an award of such costs is not a device used by trial courts to control pretrial proceedings. Instead, as with attorney fees and costs awarded after judgment to a prevailing party, an award of costs of proof is a fee shifting and cost allocation mechanism that is available against parties." (*City of Glendale v. Marcus Cable Associates, LLC*, *supra*, 235 Cal.App.4th at p. 354.)

B. *The Trial Court Retained Jurisdiction to Consider Farhoomand's Postjudgment Motion for Cost-of-Proof Sanctions Pending Caine's Appeal*

Caine contends that Farhoomand's motion for cost-of-proof sanctions was not an act of enforcing a judgment or order but instead sought a new judgment or order. She maintains that as a consequence, the motion was precluded under section 916 and the court lacked authority to make additional findings pending her appeal. Caine argues that if her appeal is successful, it would render some or all of her denials accurate and Farhoomand's motion "an impossibility" such that Farhoomand's motion "is properly deemed 'embraced' in or 'affected' by" the appeal and subject to the stay. She further argues, citing *Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180 (*Varian*), that Farhoomand's motion is not "ancillary" to the appealed judgment; it was not a proceeding that "could or would have occurred regardless of the outcome of the appeal." (*Id*. at p. 191.) She asks us to vacate the court's order awarding Farhoomand $294,488.05.

Section 916, subdivision (a) provides in part that "the perfecting of an appeal stays proceedings in the trial court upon the judgment or order appealed from or upon the

27

matters embraced therein or affected thereby, including enforcement of the judgment or order, but the trial court may proceed upon any other matter embraced in the action and not affected by the judgment or order."  "Under section 916, 'the trial court is divested of' subject matter jurisdiction over any matter embraced in or affected by the appeal during the pendency of that appeal.  [Citation.]  'The effect of the appeal is to remove the subject matter of the order from the jurisdiction of the lower court . . . .'  [Citation.]  Thus, 'that court is without power to proceed further as to any matter embraced therein until the appeal is determined.' "  (*Varian*, *supra*, 35 Cal.4th at pp. 196-197, fn. omitted, see also *Young v. Tri-City Healthcare Dist.* (2012) 210 Cal.App.4th 35, 51.)  "[W]hether a matter is 'embraced' in or 'affected' by a judgment within the meaning of section 916 depends upon whether postjudgment trial court proceedings on the particular matter would have any impact on the 'effectiveness' of the appeal.  If so, the proceedings are stayed; if not, the proceedings are permitted."  (*Elsea v. Saberi* (1992) 4 Cal.App.4th 625, 629.)  However, "the pendency of an appeal does not divest the trial court of jurisdiction to determine ancillary or collateral matters which do not affect the judgment on appeal."  (*Betz v. Pankow* (1993) 16 Cal.App.4th 931, 938.)

In *Varian*, the California Supreme Court explained that a proceeding on a trial court matter does not have an impact on the effectiveness of a pending appeal merely because the proceeding may impact the *outcome* of the appeal, or even render it moot.  (*Varian*, *supra*, 35 Cal.4th at p. 189 ["The fact that the postjudgment or postorder proceeding may render the appeal moot is not, by itself, enough to establish that the proceeding affects the effectiveness of the appeal and should be stayed under section

28

916"].)  "[S]omething more is needed.  For example, the trial court proceeding must directly or indirectly seek to 'enforce, vacate or modify [the] appealed judgment or order.' . . .  Or the proceeding must substantially interfere with the appellate court's ability to conduct the appeal."  (*Id.* at pp. 189-190, fn. and citation omitted.)  "A trial court . . . affects the effectiveness of an appeal if the possible outcomes on appeal and the actual or possible results of the proceeding are *irreconcilable*" or "if the very purpose of the appeal is to *avoid the need for that proceeding*."  (*Id.* at p. 190, italics added.)  None of those situations are present here.

Caine's arguments concerning the "impossibility" of Farhoomand's motion is misplaced as it is premised on the outcome of the appeal, not the impact of the postjudgment motion.  She does not explain how Farhoomand's postjudgment motion indirectly or directly sought to enforce, vacate or modify the appealed judgment, or would substantially interfere with this court's ability to conduct the present appeal.  (*Varian*, *supra*, 35 Cal.4th at p. 189.)  Likewise, we need not address her argument that the motion is not ancillary because it would have occurred regardless of the appeal's outcome.  *Varian* makes clear that this is a *separate* basis to conclude a postjudgment proceeding is permitted as ancillary or collateral.  (*Id*. at p. 191 ["A postjudgment or postorder proceeding is *also* ancillary or collateral to the appeal despite its potential affect on the appeal, if the proceeding could or would have occurred regardless of the outcome of the appeal"], italics added.)  Because we conclude Farhoomand's motion is not embraced in or affected by the judgment, his motion proceedings were permitted.  (*Id*. at p. 190.)

29

Farhoomand's motion constitutes a postjudgment proceeding to shift and allocate costs, akin to a postjudgment motion for prevailing party attorney fees and costs, which, as we have stated above, is not stayed under section 916 pending an appeal. (*Robertson v. Rodriguez* (1995) 36 Cal.App.4th 347, 360; *Bankes v. Lucas*, *supra*, 9 Cal.App.4th at p. 368.) A postjudgment motion seeking prevailing party attorney fees is not stayed under section 916 even though a successful appeal may change prevailing party status and eliminate the basis for granting fees. Because Farhoomand's motion for cost-of-proof sanctions is not a matter embraced within or affected by this appeal, the pendency of this appeal did not divest the trial court of jurisdiction over his motion.

C. *The Trial Court Did Not Abuse its Discretion In Awarding Attorney Fees as Cost-of-Proof Sanctions*

As stated, the determination of whether Caine had reasonable grounds to believe she would prevail on the issues and the amount of expenses are all within the sound discretion of the trial court. (See *Brooks v. American Broadcasting Co.*, *supra*, 179 Cal.App.3d at p. 508; *City of Glendale v. Marcus Cable Associates, LLC*, *supra*, 235 Cal.App.4th at pp. 351-352.) An abuse of discretion occurs when it is shown the court's ruling is arbitrary or capricious (*Culbertson v. R.D. Werner Co., Inc.* (1987) 190 Cal.App.3d 704, 710), or exceeds the bounds of reason. (*Piscitelli v. Friedenberg* (2001) 87 Cal.App.4th 953, 972; accord, *Denham v. Superior Court* (1970) 2 Cal.3d 557, 566 [abuse of discretion requires a showing that the trial court " ' "exceed[ed] the bounds of reason, all of the circumstances before it being considered" ' "].) Under this deferential

30

standard of review, we must uphold the trial court's determination, even if we disagree with it, as long as it is reasonable. (*Stull v. Sparrow*, *supra*, 92 Cal.App.4th at p. 864.)

Caine contends the trial court erred when it awarded Farhoomand substantial attorney fees under section 2033.420. She does not challenge the notion that the requested admissions were of substantial importance to the action, or that Farhoomand ultimately proved them, and we conclude these issues met that test. (See *Wimberly v. Derby Cycle Corp.* (1997) 56 Cal.App.4th 618, 634 ["An issue is of 'substantial importance' if it has 'at least some direct relationship to one of the central issues in the case, i.e., an issue which, if not proven, would have altered the results in the case' "].) Rather, she maintains she had reasonable grounds to believe she would prevail on the issues pertaining to the Juniper property's transfer, and reasonably denied Farhoomand's request to admit that he did not commit financial elder abuse. Regarding the property's transfer, Caine points out it was undisputed she did not deliver the deed to Farhoomand or record the instruments, which invalidated the transfer and negated any intent to transfer on her part. She argues that in view of the marijuana evidence, which she was prevented from discussing on the eve of trial, she reasonably believed she would prevail.

The trial court did not abuse its broad discretion in this case; its ruling did not exceed the bounds of reason. Caine ignores a vast amount of evidence contradicting her claims and affecting her credibility, including matters within her own personal knowledge, most of which existed before any litigation commenced, including Caine's handwritten note to Farhoomand congratulating him and referring to the Juniper property as "your new home," and the mortgage ledgers in Caine's handwriting reflecting

31

Farhoomand's payments to her and the total mortgage amount. Caine's own discovery admissions explained how she reached the total principal sum of $605,000. She disregards the testimony of her own realtor that Caine was buying the property for Farhoomand, and Kessinger's testimony that Caine told her she was going to be Farhoomand's lender in his purchase of the Juniper property.

As for her elder abuse claim, Caine points out that it was largely undisputed at trial that Farhoomand borrowed nearly $100,000 from her, moved into the Juniper property while she was living there, but asked her to leave the house and changed the locks. She argues based on this evidence it was reasonable for her to believe she would prevail on a claim for financial elder abuse. Again, we disagree, in view of the substantial amount of evidence—all within Caine's personal knowledge before litigation commenced— contradicting Caine's characterization of events. This includes evidence establishing it was Caine who initiated the gifts and loans to Farhoomand and who directed and controlled the sale of the Juniper property to him, Caine's note showing she willingly left the Juniper property when Farhoomand asked if he could live alone there, and Kessinger's testimony that she observed no undue influence or duress in connection with the sales transaction, which she understood as Caine purchasing the Juniper property to act as a lender in the sale to Farhoomand. The overwhelming nature of the evidence against Caine is sufficient to show that she denied Farhoomand's requests for admission without the requisite good faith or a reasonable basis for believing she would prevail on Farhoomand's claims and her elder abuse claim.

32

"[I]f the trial court exercises its discretion and determines that the requirements of the statute exist, reasonable expenses *must* be awarded." (*Brooks v. American Broadcasting Co.*, *supra*, 179 Cal.App.3d at p. 508; see § 2033.420, subd. (b).) Because Caine raises only the reasonableness of her denials without challenging the specific amount of fees requested by Farhoomand, she has not shown the court abused its discretion in awarding Farhoomand $287,040 in attorney fees.

## DISPOSITION

The judgment is reversed to the extent it declares the purchase price of the Juniper property to be $525,000. The matter is remanded with directions that the superior court modify the amended judgment to omit that declaration. In all other respects, the judgment is affirmed. The parties shall bear their own costs on appeal.


O'ROURKE, J.

WE CONCUR:

HUFFMAN, Acting P. J.

IRION, J.

33